UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| TRACEY RING, | CASE NO. 3:21-CV-00265-JGC |
| Plaintiff, | JUDGE JAMES G.CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Tracey Ring filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 2, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation (non-document entry of February 2, 2021), and was subsequently reassigned to me pursuant to General Order 2021-06 (on-document entry of May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Ring filed for DIB on April 21, 2019, alleging a disability onset date of April 3, 2018. (Tr. 63). Her claims were denied initially and on reconsideration. (Tr. 62-78, 80-94). She then requested a hearing before an Administrative Law Judge. (Tr. 105-06). Ms. Ring (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on June 18, 2020. (Tr. 37-61). On June 30, 2020, the ALJ issued a written decision finding Ms. Ring not disabled. (Tr. 7-20). The Appeals Council denied Ms. Ring's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Ring timely filed this action on February 1, 2021. (ECF #1).

FACTUAL BACKGROUND[1]

I.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Ring and VE Steele, presented during the hearing before the ALJ.

Ms. Ring testified she experiences pain in both of her hips and in her lower back. (Tr. 46-47). She was unable to handle the duties of her job due to her hip and back pain. (Tr. 46). Ms. Ring takes diclofenac, an NSAID, to control the pain. (Tr. 47). Ms. Ring stated that with diclofenac, her pain is a seven out of ten; without diclofenac, her pain would be a ten. (*Id.*). She sometimes has nausea if she takes her medication on an empty stomach. (Tr. 47-48).

---

[1]    Ms. Ring raises error with the ALJ's finding that she could perform light work. (Pl.'s Br., ECF #14, PageID 399-405). Ms. Ring has submitted a fact sheet indicating the facts relevant to her claim. (*Id.* at PageID 407-16). I therefore summarize here the relevant hearing testimony and record evidence as presented in her fact sheet.

Ms. Ring also takes Celexa for her anxiety. (Tr. 48). Her anxiety is helped with medication, and is better than it was in the past. (*Id.*). She testified that her anxiety alone would not prevent her from being able to work. (*Id.*).

Ms. Ring is only able to walk about 400 feet on a good day; on bad days she is only able to walk from her bed to the bathroom. (Tr. 48-49). She can stand for at least an hour and a half without needing to sit down on a good day. (Tr. 49). On a bad day, she can only stand for five minutes. (*Id.*). Similarly, she can sit for an hour and a half on a good day and only for three minutes on a bad day. (*Id.*). She can lift ten pounds on a good day, but cannot lift a gallon of milk (estimated at five pounds) on a bad day. (*Id.*).

Because of her pain, Ms. Ring is unable to sleep at night. (Tr. 49-50). She gets three to four hours of interrupted sleep per night and must take naps during the day. (*Id.*). Ms. Ring cannot bathe or shower on her own. (Tr. 50). Her husband helps her get into and out of the shower; he also washes her legs from the knees down. (Tr. 50, 52-53). Her husband also helps her put on her socks and shoes. (Tr. 50). Ms. Ring can make simple meals such as microwave dinners, but she is unable to make full meals like she used to do. (Tr. 51, 53). Her husband does chores such as cleaning the house, washing dishes, and doing laundry. (Tr. 51). Her daughter does the grocery shopping. (*Id.*). Ms. Ring leads a sedentary lifestyle. On bad days, she lays in her bed most of the day; on good days she can sit upright on the couch but must stand up, stretch, or change position because of her hip pain. (Tr. 54). She must lay down three to four times, even on good days. (Tr. 55).

The VE then testified. The ALJ presented the following hypothetical to the VE: Consider an individual of Ms. Ring's age, education, and work experience, who can perform at the light

exertional level with additional limitations to occasionally climb ramps and stairs; never climb ladders ropes, or scaffolds; frequently balance, occasionally stoop, kneel, crouch, and crawl; occasionally operate foot controls with the bilateral lower extremities; never be exposed to hazards such as moving machinery, unprotected heights, or commercial driving; can respond appropriately to occasional interaction with supervisors and coworkers, but should not interact with the general public. (Tr. 57-58). The VE responded that such an individual could perform light, unskilled work. (Tr. 58). The jobs an individual so limited could perform included: retail marker, SVP 2, DOT 209.587-034, 125,000 jobs in the national economy; general office helper, SVP 2, DOT 239.567-010, 74,000 jobs in the national economy; and hand packer, SVP 2, DOT 559.687-074, 165,000 jobs in the national economy. (*Id.*).

The ALJ then acknowledged that Ms. Ring's age would preclude employment and her lack of past work would preclude the finding of transferable skills if the hypothetical limited the individual to a sedentary exertional level. (*Id.*). However, the ALJ asked the VE to comment on off-task behavior. (*Id.*). The VE testified that up to ten percent off-task behavior is common and tolerated in competitive work, but more than that—for example, consistent fifteen percent off-task behavior—becomes work preclusive. (*Id.*). One attendance incident (arriving tardy, leaving early, being excused in the middle of the day) per month is tolerable. (Tr. 59).

In response to a question by Ms. Ring's attorney, the VE confirmed that unscheduled breaks to lay down would be poorly tolerated; a consistent need for unscheduled breaks is work preclusive. (Tr. 60). There is also no tolerance for accommodating an employee's need to lay down flat while working outside of normally scheduled lunch or breaks. (*Id.*).

4

## II.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Ring was 50 years old at the time of her alleged onset date, and 52 years old at the time of the administrative hearing. (Tr. 43, 62). Ms. Ring completed twelfth grade and has a high school diploma. (Tr. 44). Ms. Ring last worked part-time at a department store in April 2018, but this was not considered past relevant work because it was not performed at a level consistent with substantial gainful activity. (Tr. 12, 19, 45, 57).

## III.  RELEVANT MEDICAL EVIDENCE

**Psychological Evaluation.** On July 10, 2019, Ms. Ring underwent a psychological evaluation conducted by Wayne Morse, Ph.D. (Tr. 268-71). During the evaluation, Ms. Ring had an anxious mood with constricted affect. (Tr. 269-70). Her insight and judgment were good, and Dr. Morse assessed Ms. Ring as able to make independent, responsible decisions in social situations. (Tr. 270).

Ms. Ring reported that she has had anxiety and worsening depression since "all this medical stuff" started happening. (Tr. 268). She thinks about suicide "probably once a month." (*Id.*). Dr. Morse described Ms. Ring as having suicidal thoughts and plan, but with no serious intent, immediacy, or preparatory behavior. (Tr. 270). Ms. Ring also endorsed memory and concentration issues, and described difficulty when reading even a paragraph. (Tr. 268-69). Ms. Ring denied mental health treatment, although reported that her citalopram (Celexa) medication was helpful. (Tr. 269).

Dr. Morse diagnosed Ms. Ring with social anxiety disorder; major depressive disorder single episode, moderate; and generalized anxiety disorder. (Tr. 270). Based on how Ms. Ring performed during the examination, Dr. Morse found she was able to understand, remember, and

carry out multi-step workplace instructions; able to concentrate and persist in work-related activity; could respond appropriately to supervisors, coworkers, and the public in a work setting; and respond appropriately to normal pressures in a work setting. (Tr. 271).

**Medical Imaging.** Ms. Ring had an X-ray of the lumbar spine on July 10, 2019. (Tr. 265). Richard Patterson, Jr., M.D. reviewed the X-ray and described the findings as mild curvature and vertebral malalignment, disc space narrowing and degenerative changes, but no acute bony abnormality. (*Id.*). Disc space narrowing and discovertebral degenerative changes were present at T11-T12, L1-L2, L3-L4, and L4-L5. (*Id.*). Facet arthritis was greatest in the lower lumbar spine. (*Id.*).

On September 25, 2019, Ms. Ring had an X-ray of both hips after a fall. (Tr. 305). Dr. Patterson found no acute fracture or dislocation. (*Id.*). There were mild arthritic changes along the acetabular roof. (*Id.*). Enthesophytes (bony spurs) were noted arising from the greater trochanter. (*Id.*).

**Firelands Physician Group.** Ms. Ring presented to James Berry, M.D., on July 25, 2018, complaining of bilateral hip pain, left worse than right. (Tr. 261). Ms. Ring reported lateral hip pain for the past two years, which had been progressing. (*Id.*). The pain was worse at night; she was unable to lay on her left side due to pain. (*Id.*). On examination, Ms. Ring was tender over the greater trochanter and proximal tensor fascia bilaterally. (Tr. 262). She had a normal gait pattern, normal strength in her bilateral lower extremities, negative straight leg tests bilaterally, and non-painful rotation of the bilateral hip. (*Id.*). Dr. Berry diagnosed Ms. Ring with trochanteric bursitis in her bilateral hips. (*Id.*). Dr. Berry ordered an X-ray of her bilateral hips and prescribed Diclofenac. (*Id.*). Jennifer Kearney, NP-C, performed cortisone injections in Ms. Ring's bilateral

hips. (Tr. 262-63). Ms. Ring tolerated the procedure well with no adverse reaction and was recommended to continue activity as tolerated. (*Id.*).

Ms. Ring presented to NP Kearney on March 1, 2019, for follow-up after receiving cortisone injections in her bilateral hips. (Tr. 259). NP Kearney assessed Ms. Ring as having trochanteric bursitis of her left and right hip. (*Id.*). Ms. Ring's bilateral hip was tender over the greater trochanter and proximal tensor fascia. (*Id.*). Ms. Ring had non-painful rotation of the hip, full and non-painful knee range of motion, and her calf and thigh were soft and non-tender. (*Id.*).

NP Kearney recorded that Ms. Ring last had a cortisone injection on July 25, 2018, which relieved her pain up until about six weeks prior to the appointment. (*Id.*). Ms. Ring was also provided with a Diclofenac prescription. (*Id.*). Ms. Ring described her pain as a seven on a ten-point scale, and requested a repeat injection. (*Id.*). NP Kearney performed a cortisone injection into the tender point on each hip and recommended activity as tolerated. (Tr. 259-60).

On May 8, 2019, Ms. Ring presented to Marsha Cooper, M.D., to establish care. (Tr. 253). Ms. Ring's gait was normal during the examination; she also exhibited normal duck walk and one leg hop. (Tr. 254). She had normal range of motion in all joints. (*Id.*). Dr. Cooper assessed Ms. Ring with uncontrolled hypertension, chronic anxiety, and morbid obesity due to excess calories. (Tr. 254-55). Ms. Ring reported having taken antihypertensives in the past, but had stopped after not seeing a doctor for some time; Dr. Cooper started Ms. Ring on amlodipine besylate and triamterene-HCTZ. (*Id.*). Dr. Cooper also started Ms. Ring on Citalopram for her anxiety. (Tr. 255).

On June 28, 2019, Ms. Ring met with NP Kearney for a follow-up after her cortisone injection. (Tr 257). Ms. Ring had fallen four days prior, had increased pain at her left hip, and was

walking with more of a limp. (*Id.*). Ms. Ring reported the cortisone injection had helped for a week. (*Id.*). NP Kearney noted tenderness over the greater trochanter and proximal tensor fascia bilaterally. (*Id.*). Ms. Ring otherwise had full, non-painful rotation of the hip and full, non-painful active and passive knee range of motion. (*Id.*). NP Kearney performed a cortisone injection into the bilateral trochanteric bursa, which Ms. Ring tolerated well with no signs of adverse reaction. (Tr. 258). NP Kearney prescribed tizanidine. (*Id.*).

On September 25, 2019, Ms. Ring returned to Dr. Berry complaining of bilateral hip pain. (Tr. 282). She reported some relief from the previous cortisone injections and requested injections again. (*Id.*). Ms. Ring displayed antalgic gait with obvious limp favoring the involved side. (Tr. 282). She had tenderness over the greater trochanter and proximal tensor fascia, and minimal painful rotation of the hip. (*Id.*). Ms. Ring otherwise had full strength and range of motion. (Tr. 282-83). X-rays showed mild loss of the joint spaces of the left hip and mild spur formation at the greater trochanters, left greater than right. (Tr. 283). Dr. Berry performed a cortisone injection on Ms. Ring's left hip. (*Id.*). Ms. Ring tolerated the procedure well. (*Id.*).

On October 31, 2019, Ms. Ring presented to Dr. Cooper for a check-up. (Tr. 285). Ms. Ring reported she was continuing to see Dr. Berry for her hip joint. (*Id.*). Dr. Cooper noted Ms. Ring's uncontrolled hypertension, for which Dr. Cooper prescribed labetelol; she also recommended that Ms. Ring self-monitor her blood pressure three times weekly and start a low-sodium diet. (Tr. 286). Dr. Cooper also noted Ms. Ring's morbid obesity, due to excess calories. (*Id.*). Ms. Ring reported she was seeing a dietician. (*Id.*).

On November 25, 2019, Ms. Ring reported to Dr. Cooper that she had been checking her blood pressure at home and it had been lower; it was 127/78 that morning. (Tr. 296). Dr. Cooper noted Ms. Ring's lipids were rising and she had gained weight. (*Id.*).

On February 5, 2020, Ms. Ring presented to Dr. Berry for follow-up on her bilateral hip pain after cortisone injection on the left on September 25, 2019, and right on June 28, 2019. (Tr. 300). Dr. Berry diagnosed Ms. Ring with primary osteoarthritis of both hips at this visit. (Tr. 301). Ms. Ring had antalgic gait with a limp favoring the involved side. (*Id.*). She had tenderness over the greater trochanter and proximal tensor fascia, and minimal painful rotation of the hip. (Tr. 300). Ms. Ring otherwise had full strength and range of motion. (*Id.*). Dr. Berry discussed treatment options including oral or topical NSAIDs, physical therapy with iontophoresis,[2] or cortisone injection to the greater trochanteric bursa. (Tr. 301). Ms. Ring received cortisone injections bilaterally. (*Id.*).

On May 21, 2020, Ms. Ring presented to NP Kearney complaining of bilateral hip pain. (Tr. 303). Ms. Ring reported pain relief after injections, lasting for two months with gradual return. (*Id.*). She did not complain of groin pain with using stairs. (*Id.*). Ms. Ring had antalgic gait with limp on the involved side and positive groin pain with passive internal rotation of the hip. (*Id.*). NP Kearney performed a cortisone injection in Ms. Ring's bilateral hips. (Tr. 304).

IV.  MEDICAL OPINIONS

**State Agency Reviewers.** On July 18, 2019, Sreenivas Venkatachala, M.D., reviewed Ms. Ring's DIB claim at the initial level. (Tr. 62-78). Dr. Venkatachala opined that Ms. Ring had

---

[2]     Iontophoresis is a method to deliver medication directly to the tissues through the use of electric currents. *Iontophoresis*, *Stedman's Medical Dictionary*, 25th Ed. (1990).

exertional limitations due to back pain from degenerative disc disease in the lumbar spine, early osteoarthritis in both hips, and obesity with a BMI of 50.1. (Tr. 73). Dr. Venkatachala found Ms. Ring could lift twenty pounds occasionally, ten pounds frequently, and could sit, stand, and/or walk for six hours in an eight-hour workday. (*Id.*). She could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, crawl, and frequently balance. (Tr. 73-74). Ms. Ring was to avoid all exposure to unprotected heights and hazardous moving machinery. (Tr. 74).

Linda Hall, M.D., reviewed Ms. Ring's claim at the reconsideration level on December 2, 2019. (Tr. 89-91). Dr. Hall agreed with Dr. Venkatachala's findings, stating "[u]pdated evidence does not support significant changes to initial RFC limitations." (*Id.*).

Michael Cremerius, Ph.D., reviewed her claim on July 27, 2019 and found Ms. Ring had no understanding or memory limitations, nor any sustained concentration and persistence limitations. (Tr. 75-76). She was found moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, and in her ability to get along with coworkers or peers. (Tr. 75). Dr. Cremerius stated Ms. Ring would be limited to brief and superficial contact with coworkers and supervisors, and no contact with the public. (*Id.*).

On October 10, 2019, David Dietz, Ph.D., agreed with Dr. Cremerius's findings. (Tr. 91-92).

Ms. Ring was found able to perform work at a light RFC and was therefore determined not disabled. (Tr. 76-77, 93).

**Dr. Cooper.** On July 10, 2019, Dr. Cooper performed a consultative examination of Ms. Ring. (Tr. 275-81). Dr. Cooper noted full strength and range of motion in all areas. (Tr. 275-78).

In an attached letter, Dr. Cooper noted Ms. Ring had just started seeing her, and indicated Ms. Ring applied for disability due to pain in both hips and low back. (Tr. 279). Ms. Ring had seen an orthopedic surgeon who had diagnosed her with bilateral trochanteric bursitis. (*Id.*). Ms. Ring sees Dr. Berry for hip pain, and he has injected the area and provided a prescription for oral NSAIDs. (*Id.*).

Dr. Cooper stated that Ms. Ring's examination was remarkable for obesity, and Ms. Ring showed some evidence of bursitis. (Tr. 281). However, the medical evaluation did not support a diagnosis of disability based on findings and history. (*Id.*). In Dr. Cooper's estimation, Ms. Ring's bursitis is treatable and should resolve with appropriate management. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated June 30, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.

2. The claimant has not engaged in substantial gainful activity since April 3, 2018, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease of the bilateral hips with trochanteric bursitis; mild degenerative changes of the lumbar spine; morbid obesity with a BMI of 50.1; social anxiety disorder; major depressive disorder, single episode, moderate; generalized anxiety disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; occasionally operate foot controls with the bilateral lower extremities; never be exposed to hazards such as moving machinery, unprotected heights, or commercial driving; and can respond appropriately to occasional interaction with supervisors and co-workers, but should have not have interaction with the general public.

6.      The claimant has no past relevant work (20 CFR 404.1565).

7.      The claimant was born on December 8, 1967 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-20).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

13

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

14

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION[3]

Ms. Ring asserts the ALJ's decision that she can perform the demands of light work is not supported by substantial evidence and violates SSR 16-3p and 20 C.F.R. § 404.1529. (Pl.'s Br., ECF #14, PageID 399, 401). Ms. Ring concedes the ALJ set forth "some reasoning" in support of the decision, but argues that the evidence cited by the ALJ supports her subjective allegations that she cannot perform light work. (*Id.* at PageID 401-04). The Commissioner opposes, arguing that the ALJ thoroughly discussed objective findings, medical treatment, medications, Ms. Ring's daily activities, and other relevant factors in accordance with 20 C.F.R. § 404.1529 and SSR 16-3p. (Comm'r's Br., ECF #16, PageID 428-32). In the Commissioner's estimation, Ms. Ring has not shown that the ALJ's decision was inaccurate; rather, her argument amounts to asking this Court to re-weigh the evidence, which is not permissible. (*Id.* at PageID 430). Following review of the record, I agree with the Commissioner.

When determining whether a claimant is disabled, the ALJ will "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can

---

[3]     Ms. Ring makes a number of arguments attacking the ALJ's consideration of the evidence, but does little to provide a legal basis for her claims. Any argument not discussed in this Report and Recommendation is deemed waived because it was not fairly presented for review. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

reasonably be accepted as consistent with the objective medical and other evidence." 20 C.F.R. § 404.1529(a).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

(1)    a claimant's daily activities;
(2)    the location, duration, frequency, and intensity of pain or other symptoms;
(3)    factors that precipitate and aggravate the symptoms;
(4)    the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
(5)    treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
(6)    any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
(7)    any other factor concerning the claimant's functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p. The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). The ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. SSR 16-3p.

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and

other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ considered factors such as:

[Ms. Ring] reported that she is able to wash dishes, do laundry and prepare meals taking breaks every thirty minutes . . . she needs assistance getting out of the bathtub[,] combing her hair and putting on her socks and shoes but is otherwise able to manage her personal care. She reported that she goes outside daily; however, she is unable to drive due to pain in her hips when using the pedals. She stated that she has difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and climbing stairs. She indicated that she is able to lift up to ten pounds and that she is unable to reach overheard or climb stairs. She reported that she is able to walk for up to fifteen minutes before needing to rest for thirty minutes.

. . .

17

She reported that she stopped working due pain in her hips and lower back. She described the pain and throbbing, stabbing and achy. She rated the pain between six and ten out of ten. She testified that she takes diclofenac for pain and that she will occasionally experience nausea if she takes the medication on an empty stomach. The claimant reported that she takes Celexa for anxiety, which reportedly helps reduce her symptoms. . . . She testified that she is able to walk 400 feet, can stand and sit for an hour and a half, and can lift a gallon of milk on a good day; however, on a bad day she is limited to standing for up to five minutes and can sit for up to three minutes on a bad day. She reported having fifteen bad days per month or three per week. She indicated that she gets three hours of sleep at night and that she will nap throughout the day.

(Tr. 15) (internal citations omitted). The ALJ then found that Ms. Ring's medically determinable impairments could cause her symptoms, but found her statements "not entirely consistent with the medical evidence," explaining:

The claimant received bilateral trochanteric steroid injections in July of 2018, which reportedly helped for until February of 2019. In March of 2019, claimant received bilateral bursa injections; however, it reportedly only helped for a week. . . Upon examination, the claimant was noted to have tenderness at the bilateral trochanter and proximal tensor fascia; however, she retained a non-painful rotation of the hip with a full, non-painful active and passive range of motion in the knees bilaterally. Imaging of the claimant's left hip noted mild loss of joint space and mild enthesophyte formation at the greater trochanter. The claimant received a cortisone injection into the left trochanteric bursa. . . . In February of 2020, the claimant continued to report some relief with cortisone injections and requested additional injections. . . . The claimant was diagnosed with primary osteoarthritis of the bilateral hips and received bilateral Kenalog injections. Office notes from May indicate that the claimant experienced two months of relief before the pain gradually returned. Upon examination of the left hip, the claimant was noted to have tenderness at the bilateral trochanter and proximal tensor fascia; however, she retained a non-painful rotation of the hip with a full, non-painful active and passive range of motion in the knees bilaterally. Her gait was reportedly antalgic with an obvious limp favoring "the involved side". Examination of the right hip noted positive groin pain with passive internal rotation of the hip. The claimant received another injection into the bilateral hips.

(Tr. 16-17). The ALJ provides additional explanation in the decision that is not contained in these excerpts. (*See* Tr. 14-18). But even these portions of the decision show that the ALJ considered most, if not all, of the prescribed factors found in 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p: Ms.

Ring's daily activities (*e.g.* "she needs assistance getting out of the bathtub combing her hair and putting on her socks and shoes but is otherwise able to manage her personal care"); the location, duration, frequency, and intensity of pain or other symptoms (*e.g.*, "She reported that she stopped working due pain in her hips and lower back. She described the pain and throbbing, stabbing and achy. She rated the pain between six and ten out of ten."); factors that precipitate and aggravate the symptoms; her medications (*e.g.*, "she takes diclofenac for pain"); treatment, other than medication (*e.g.*, "[she] received bilateral trochanteric steroid injections in July of 2018, which reportedly helped[] until February of 2019. In March of 2019, claimant received bilateral bursa injections; however, it reportedly only helped for a week"); and any measures other than treatment an individual uses or used to relieve pain or other symptoms (*e.g.*, "[Ms. Ring] reported that she is able to wash dishes, do laundry and prepare meals *taking breaks every thirty minutes*") (emphasis added).

This analysis demonstrates the ALJ thoroughly considered all of the prescribed factors and set forth a comprehensive explanation for her findings. Ms. Ring has not presented evidence unconsidered by the ALJ that would lead me to disturb the ALJ's decision.

Ms. Ring also asserts the ALJ should not have found the December 2019 opinion from State agency reviewing physician Dr. Hall generally persuasive, because additional evidence in February 2020 showed Ms. Hall's condition worsened and her pain returned after the cortisone injections wore off. (Pl.'s Br., ECF #14, PageID 404-05). Ms. Ring claims that if Dr. Hall had that evidence before her, it could have changed her opinion, and, presumably, the ALJ's decision as well. (*Id.*).

Ms. Ring's analysis is faulty. As the Sixth Circuit has explained, "[t]here is no categorical requirement that a non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.'" *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96-6p). It stands to reason that, because agency review predates the ALJ's hearing, "[t]here will always be a gap between the time the agency experts review the record and give their opinion . . . and the time the hearing decision is issued." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (internal quotations omitted). Remand is not warranted "[a]bsent a clear showing that the new evidence renders the prior opinion untenable." *Id.* "If an ALJ's decision includes a discussion of medical opinions or other evidence post-dating the State agency opinions, courts will generally find no error as the ALJ adequately reviewed the complete case record." *Brown v. Saul*, No. 1:18-CV-1463, 2019 WL 4039055, at *6 (N.D. Ohio Aug. 27, 2019) (collecting cases).

Here, the ALJ considered the February and May 2020 evidence Ms. Ring cites in her brief that "could have changed the opinion of Dr. Hall." (Pl.'s Br., ECF #14, PageID 404). In her discussion, the ALJ states:

> In February of 2020, the claimant continued to report some relief with cortisone injections and requested additional injections. Exam findings remained unchanged from prior exams. The claimant was diagnosed with primary osteoarthritis of the bilateral hips and received bilateral Kenalog injections. Office notes from May indicate that the claimant experienced two months of relief before the pain gradually returned. Upon examination of the left hip, the claimant was noted to have tenderness at the bilateral trochanter and proximal tensor fascia; however, she retained a non-painful rotation of the hip with a full, non-painful active and passive range of motion in the knees bilaterally. Her gait was reportedly antalgic with an obvious limp favoring "the involved side." Examination of the right hip noted positive groin pain with passive internal rotation of the hip. The claimant received another injection into the bilateral hips.

(Tr. 17) (internal citations omitted). This passage evidences that the ALJ considered the new evidence but still determined Ms. Ring was not disabled. Moreover, the ALJ considered Ms. Ring's testimony at the hearing in June 2020 and, based on her subjective symptoms, incorporated additional limitations into the RFC. (Tr. 18). I find no error here.[4]

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB supported by substantial evidence and recommend the decision be affirmed.

Dated: May 12, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

---

[4]      Ms. Ring also attacks the additional limitation to only occasionally operating foot controls with the bilateral lower extremities. (Pl.'s Br., ECF #14, PageID 404). She asserts that because she has pain when using the pedals while driving, it also means that she cannot stand/walk for six hours. (*Id.*). I find no merit to this argument. Pain while driving, seated, and operating foot pedals is an activity distinct from standing and walking. It was reasonable for the ALJ to include an additional limitation specific to Ms. Ring's testimony while not extending her decision beyond that specific need. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

21

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).